# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
SONYA PETTAWAY,                         )
                                        )
                    Plaintiff,          )
                                        )
          v.                            )     Civil Action No. 07-1721 (RBW)
                                        )
                                        )
TEACHERS INSURANCE AND ANNUITY          )
ASSOCIATION OF AMERICA, et al.,         )
                                        )
                    Defendants,         )
_____)

## MEMORANDUM OPINION

The plaintiff, Sonya Pettaway, brings this action under the Employee Retirement Income

Security Act of 1974 (the "ERISA"), 29 U.S.C. §§ 1132(a)(1)(B), (a)(3), and 1133 (2006),

against the Teachers Insurance and Annuity Association of America (the "Teachers'

Association"), Standard Benefit Administrators (the "SB Administrators"), and the National

Academy of Sciences Group Total Disability Insurance Plan (the "Academy Plan" or "Plan")

(collectively the "defendants") alleging that the defendants violated the ERISA by wrongfully

terminating her benefit coverage and by not following proper procedures in the course of

administering her claim.  See Complaint ("Compl.") ¶¶ 1, 13, 16-17.  The defendants deny the

allegations.  See Answer of the National Academy of Sciences Group Total Disability Insurance

Plan ("Def. Acad.'s Answer") ¶¶ 1, 16-20; Answer of the Teachers' Association and the SB

Administrators ("Defs. Teachers'/Adm'or's Answer") ¶¶ 16-19.  The Court previously ruled that

the plaintiff's claims were not time-barred under the doctrine of equitable tolling, Pettaway v.

Teachers Ins. & Annuity Ass'n of America, 547 F. Supp. 2d 1, 7-8 (D.D.C. 2008) (Walton, J.),

and currently before the Court are the parties' cross-motions for summary judgment.[1]  Upon

consideration of the parties written submissions and the administrative record in this case, for the

reasons set forth below the Court must deny the plaintiff's motion and grant summary judgment

to the defendants.

# I. BACKGROUND

A.  The Academy Plan

During the time period relevant to this litigation, the plaintiff was employed by the

National Academy of Sciences (the "Academy") and enrolled in the disability plan it sponsored

as a benefit for its employees.  Compl. ¶ 6; Def. Acad.'s Answer ¶ 6.  See generally Def. Acad.'s

Mem., Attach. A to Declaration ("Decl.") of Shelia Wright (National Academy of Sciences Total

Disability Insurance Plan).  The Academy Plan is accompanied by a Summary Plan Description.

See generally Def. Acad.'s Mem., Attach. B to Decl. of Shelia Wright (Total Disability

---

[1]  The Court also considered the following papers filed in connection with the parties' summary judgment motions:
(1) Statement of Facts in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Stmt."); (2) Plaintiff's
Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Mem."); (3)
Plaintiff's Opposition to NAS Group Total Disability Insurance Plan Motion for Summary Judgment ("Pl.'s Opp'n
to Acad.'s Mot."); (4) Plaintiff's Opposition to Defendants' Teachers Insurance Annuity Association and Standard
Benefit Administrator Motion for Summary Judgment ("Pl.'s Opp'n to Teachers'/Adm'or's Mot."); (5) Plaintiff's
Reply to the Briefs Opposing Plaintiff's Motion for Summary Judgment Sumitted [sic] by NAS Group Total
Disability Insurance Plan, Teachers Insurance Annuity Association, and Standard Benefit Administrator ("Pl.'s
Reply"); (6) Defendant National Academy of Sciences Group Total Disability Insurance Plan's Statement of Facts
in the Administrative Record ("Def. Acad.'s Stmt."); (7) Memorandum of Points and Authorities in Support of
Defendant NAS Group Total Disability Insurance Plan's Motion for Summary Judgment ("Def. Acad.'s Mem."); (8)
Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Summary Judgment ("Def. Acad.'s
Opp'n"); (9) Reply Memorandum of Points and Authorities in Support of Defendant NAS Group Total Disability
Insurance Plan's Motion for Summary Judgment; (10) Defendants Teachers Insurance Annuity Association's and
Standard Benefits Administrator's Memorandum of Points and Authorities in Support of Defendants' Joint Cross-
Motion for Summary Judgment ("Defs. Teachers'/Adm'or's Mem.") (this includes a Statement of Facts that is
largely similar to the one submitted by the Academy Plan; for the most part the Court refers to the facts outlined in
the Academy Plan's Statement); (11) Defendants Teachers Insurance Annuity Association's and Standard Benefits
Administrator's Memorandum in Opposition to Plaintiff's Cross-Motion for Summary Judgment ("Defs.
Teachers'/Adm'or's Opp'n"); and (12) Defendants Teachers Insurance Annuity Association's and Standard Benefits
Administrator's Reply in Support of Their Cross-Motion for Summary Judgment.

Insurance Plan Summary Plan Description) (the "Plan Description").[2] The Academy Plan was

created pursuant to the ERISA as an employee benefit plan, it is underwritten by the Teachers'

Association,[3] Compl. ¶¶ 4, 7; Defs. Teachers'/Adm'or's Answer ¶ 7, and the SB Administrators

serve as the administrator of the Academy Plan,[4] Compl. ¶ 5; Pl.'s Stmt. ¶ 6; Defs.

Teachers'/Adm'or's Answer ¶ 5.

The Academy Plan states that participants "shall be entitled to benefits under the Plan as

set forth in the Policy," Acad. Plan at 4.1, which is identified as "the Group Policy [number]

D1129 issued by the [Teachers' Association]," id. at 1.6. See generally Def. Acad.'s Mem.,

Attach. C to Decl. of Shelia Wright, (D-1129 Group Total Disability Insurance Certificate) (the

"Policy") at A.R. 26-169.[5] If a participant qualifies, she receives benefits in the form of monthly

---

[2] The Academy Plan and the Plan Description have their own pagination and section numbers. Neither document is however bates numbered. For the sake of simplicity, when referring to these documents, the Court will cite to their respective page or section number.

[3] Employer sponsored benefit plans covered by the ERISA include:

> Any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing its participants or their beneficiaries through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

29 U.S.C. § 1002(1) (2006).

[4] The Teachers' Association served as administrator of the Academy Plan until approximately 2003, at which point the SB Administrators became the administrator on behalf of the Teachers' Association. Defs. Teachers'/Adm'or's Mem. at 2. The plaintiff admits that both organizations served as administrators of the Academy Plan, Compl. ¶¶ 5, 7; Pl.'s Stmt. ¶ 6, and does not draw any legal distinction between these two entities, e.g., Pl.'s Mem. at 2-4; Pl.'s Opp'n to Teachers'/Adm'or's Mot. at 1-4. In part I.A of this Memorandum Opinion and when directly quoting an Academy Plan document, the Court will use the specific name of one of the two entities. In the remainder of this opinion the Court will simply refer to the organization that administered the plaintiff's claim as the "Teachers/Administrator."

[5] The administrative record in this cases is bates numbered STND1139-00001 to STND1139-01540, Defs. Teachers'/Adm'or's Mem., Decl. of Andrew M. Altschul ¶ 2, and portions of the record have been submitted to the

(continued…)

payments equal to sixty percent of her basic monthly salary, up to a certain amount, as well as annuity premium benefits to compensate for lost retirement contributions.  Id., at A.R. 164-65.

According to the Policy, benefits are awarded to participants who are "totally disabled" or have a "total disability."  Id., at A.R. 165.  The terms are used interchangeably and are defined as follows:

> (1) for the Elimination Period shown in Part I, and for the next 24 months, being completely unable due to sickness, bodily injury, or pregnancy to perform the material and substantial duties of your Normal Occupation; and
>
> (2) after those 24 months, being unable due to sickness, bodily injury, or pregnancy to perform the material and substantial duties of any occupation for which you are reasonably qualified by education, training, or experience.
>
> You must be under the Regular Care of a Physician, other than yourself or a member of your family.

Id., at A.R. 143.[6]  The Elimination Period applicable to the plaintiff's claim is six months, meaning that after receiving benefits for twenty four months, the definition of total disability shifts from the first definition to the second.  See id., at A.R. 165 (providing the two definitions

---

(. . . continued)
Court as attachments to the parties' various filings.  When citing to the administrative record, the Court will first indicate the particular filing the record was submitted with, and then use the designation "A.R." followed by the last three or four digits of the bates numbering.

[6]  Regular care is defined as:

> (1) regular in-person visits with your Physician as frequently as required under standard medical practice to effectively manage and treat your disabling sickness or injury.  Your physician must be a Physician whose specialty, expertise and experience are appropriate for the care and treatment of your Total Disability; and
>
> (2) a reasonable program of care and treatment that is, in accordance with accepted medical practice, expected to enhance your ability to work, and which is provided by a Physician whose specialty, expertise and experience are appropriate for the care and treatment of your Total Disability.

Id., at A.R. 143.

of the Elimination Period). In other words, and relevant to the dispute in this case, in order to receive benefits after the first twenty four months of payments, participants must be under the "Regular Care of a Physician" and demonstrate they are "unable due to sickness, bodily injury, or pregnancy to perform the material and substantial duties of any occupation for which [they] are reasonably qualified by education, training, or experience." Id., at A.R. 143.

In order to demonstrate their entitlement to benefits, participants must provide "proof of [their] Total Disability" to the Teachers' Association. Id., at A.R. 146. According to the Policy, examples of the kinds of proof required are "statements of treating physicians; copies of test reports or examinations; x-rays; hospital records; medical examinations by impartial specialists at [the Teachers' Association's] expense; investigations conducted by [the Teachers' Association] or outside agencies." Id., at A.R. 146. The Plan Description adds that the "insurance carrier may require a medical exam." Def. Acad.'s Mem., Attach. B to Decl. of Shelia Wright (Plan Description) at 8. The Policy also states that "[w]ritten proof of continued Total Disability is required at reasonable intervals to be determined by [the Teachers' Association]," and further indicates that "[a]ll proof must be satisfactory to [the Teachers' Association]." Def. Acad.'s Mem., Attach. C to Decl. of Shelia Wright at A.R. 146.

With respect to the Teachers' Association's role in administering claims, it is given that authority from two sources. Def. Acad.'s Mem., Attach. B to Decl. of Shelia Wright (Plan Description) at 3, 8. The first source for this authority is found in the Plan Description under the section entitled "Total Disability," which provides that "the determination of your total disability is made solely by the insurance carrier[,]" id., Plan Description at 3, and the Teachers' Association is listed as the insurer for the Academy Plan in a later section of the Plan Description titled "Summary of ERISA Information," id., Plan Description at 12. The second source for the

authority, also found in the Plan Description under the heading "Claims Procedures," states that the "[Teachers' Association] has full power and discretionary authority under the group policy to control and manage the operation and administration of the group policy, subject only to the participant's rights of review and appeal under the group policy." Id., Plan Description at 8. The same section declares that the

> [Teachers' Association] has all the powers necessary to accomplish these purposes in accordance with the terms of the group policy including, but not limited to, the following: (1) determining the benefits and amounts payable therefor[e] to any participant or beneficiary; (2) establishing and administering a claims review and appeal process; and (3) interpreting, applying, and administering the provisions of the group policy.

Id., Plan Description at 8.

If the Teachers' Association denies an application for benefits, the Policy states that the Teachers' Association must send a written denial to the claimant "specify[ing] the reason(s) for the denial, the provisions of the contract on which the denial is based, and how to ask for a review." Def. Acad.'s Mem., Attach. C to Decl. of Sheila Wright at A.R. 147. Participants therefore have the right to appeal a denial of an application for benefits. Id.

B. The Plaintiff's Medical Condition

The plaintiff, who is college educated, was employed as a technical trainer at the Academy and was enrolled in the Academy Plan when she injured her back in an automobile accident on January 10, 2000. Pl.'s Stmt. ¶¶ 1, 3; Def. Acad.'s Stmt. ¶¶ 1, 13. She did not report to work the next day and remained on leave until she eventually underwent back surgery in September 2000. Pl.'s Stmt. ¶¶ 3-4; Def. Acad.'s Stmt. ¶ 13. On October 5, 2000, the plaintiff was approved for long term disability benefits. Def. Acad.'s Stmt. ¶ 13.

About a year later, in November 2001, the Teachers/Administrator started contacting the plaintiff requesting updates regarding her condition.  Id. ¶ 17.  In January 2002, the plaintiff provided to the Teachers/Administrator records from her treating physician, Dr. Bernard Stopak, a neurosurgeon.  Pl.'s Stmt. ¶¶ 10, 13; Def. Acad.'s Stmt. ¶ 19.  Dr. Stopak's records reflected that he had not seen the plaintiff in about a year, and he later advised the Teachers/Administrator that he did not have proper authorization to conduct further diagnostic studies of her condition.  Def. Acad.'s Stmt. ¶ 19.  In light of this information, the Teachers/Administrator asked the plaintiff to undergo an Independent Medical Examination ("IM Examination") to assess her current condition.  Id. ¶ 20.

After some scheduling difficulties,[7] the plaintiff underwent the IM Examination on August 28, 2002.  Pl.'s Stmt. ¶ 11.  Dr. Arthur Korbine, the examining physician, reported that the plaintiff was a "healthy appearing female who gets up easily from the chair[,] . . . walks in a normal fashion[,]" and walks "equally well on heels and toes."  Defs. Teachers'/Adm'or's Mem., Ex. A to Decl. of Andrew M. Altschul at A.R. 321.  Examination of her lower extremities showed "normal strength, tone, reflex and sensory exam" and that "[s]traight leg raising causes back pain but no leg pain."  Id.  Dr. Kobrine's impression was that the plaintiff "continues to complain of symptoms of radiculopathy but has had no diagnostic study since surgery,"[8] and recommended that the plaintiff undergo a Magnetic Resonance Imaging scan ("MRI").  Id.  On November 13, 2002, after a further review of plaintiff's "file by an independent physician consultant and a transferable skills assessment," the Teachers/Administrator informed the

_____

[7]  The defendants point out instances in the record showing that, between March and July 2002, they had a great deal of difficulty communicating with the plaintiff, had some of their letters returned as undeliverable, and were forced to rescheduled the location and date of the IM Examination several times.  Defs. Teachers'/Adm'or's Mem. at 5-7.  The plaintiff only indirectly refutes these allegations, saying she underwent the August 2002 IM Examination after she was "properly informed" about it.  Pl.'s Stmt. ¶ 11.

[8]  Radiculopathy is a disorder of the spinal nerve roots.  Stedman's Medical Dictionary 1503 (27th Ed. 2000).

plaintiff that it would stop paying her benefits after December 2002 because her condition did not qualify as a total disability as defined by the Policy. Pl.'s Stmt. ¶ 11; Def. Acad.'s Stmt. ¶ 30.

On November 20, 2002, the plaintiff appealed the decision to terminate her benefits. Pl.'s Stmt. ¶ 12. In support of her appeal, the plaintiff provided a personal letter she had written explaining her condition, a copy of the recent August 2002 IM Examination report, and a report from Dr. Stopak dated November 28, 2000. Defs. Teachers'/Adm'or's Mem. at 7. Other than her letter, id., Ex. A to Decl. of Andrew M. Altschul at A.R. 836, the Teachers/Administrator already had copies of the other documents, and it therefore affirmed the denial of her claim because the plaintiff had not submitted any new evidence. Def. Acad.'s Stmt. ¶ 31. The January 14, 2003 denial letter from the Teachers/Administrator informed the plaintiff that her appeal request "must be accompanied by medical documentation including, but not limited to, physicians' office notes, test report results, hospital records, therapy notes, consultation and/or narrative reports that support your disability." Defs. Teachers'/Adm'or's Mem., Ex. A to Decl. of Andrew M. Altschul at A.R. 839.

Thereafter, the plaintiff saw several physicians in the first few months of 2003, and records from these visits were provided to the Teachers/Administrator. Pl.'s Stmt. ¶ 12; Def. Acad.'s Stmt. ¶ 33. Included among the documents provided was "a Lumbosacral Myelogram with a Post Myelogram" Computerized Axillary Tomography scan ("CT scan"), both performed on February 21, 2003. Pl.'s Stmt. ¶ 12. According to the radiologists' reports accompanying these procedures, the myelogram exhibited a "mild ventral extradural defect at L3-4" and a "[s]table first degree retrolisthesis at L4-5[,]" Defs. Teachers'/Adm'or's Mem., Ex. A to Decl. of Andrew M. Altschul at A.R. 1327, and the CT scan showed a "[m]ild circumferential disk bulge

at L3-L4" and a "[m]inimal circumferential disk bulge at L4-L5." Id., at A.R. 1328. Also included in the submission were more recent reports from Dr. Stopak, showing that he had scheduled a second back surgery for April 23, 2003, in part because the plaintiff's condition had become "more aggravated" following a slip and fall in Atlantic City in January 2003. Id., at A.R. 351, 361. The surgery was postponed, however, because the plaintiff had to attend a medical hearing around that same time and therefore the surgery had to be rescheduled. Def. Acad.'s Stmt. ¶ 34.

On April 22, 2003, the plaintiff was involved in a second automobile accident. Id. She was examined two days later by Dr. Stopak who recommended, "with no question in [his] mind," that the plaintiff undergo a second back surgery for a "total decompressive lumbar laminectomy [of] L3-4 and L4-5." Defs. Teachers'/Adm'or's Mem., Ex. A to Decl. of Andrew M. Altschul at A.R. 361. In a follow-up note, dated July 8, 2003, Dr. Stopak predicted that the plaintiff's post-surgery recovery time would be at least three to six months, and estimated that after recovering the plaintiff would "be able to return to work with restrictions of avoiding excessive bending and lifting over [twenty] pounds." Id., at A.R. 379.

On August 12, 2003, the Teachers/Administrator sent a letter to the plaintiff confirming the reinstatement of her disability benefits. Def. Acad.'s Stmt. ¶ 36. Dr. Arnold Kraminer, the reviewing physician for the Teachers/Administrator, based the decision on the pending surgery, and suggested that the Teachers/Administrator contact the plaintiff three to six months after the surgery to inquire about her condition. Id. ¶ 35. Dr. Kraminer indicated, however, that if "for any reason the planned surgery [was] not performed[,] updated medical information should be obtained and the file should be referred for medical review." Defs. Teachers'/Adm'or's Mem., Ex. A to Decl. of Andrew M. Altschul at A.R. 1277.

In compliance with this recommendation, the Teachers/Administrator sent letters to the plaintiff on November 7, 2003 and December 21, 2003, requesting updates on her condition. Def. Acad.'s Stmt. ¶ 37. During subsequent telephone conversations, the plaintiff informed the Teachers/Administrator that she would provide the information requested. Defs. Teachers'/Adm'or's Mem. at 9. However, by March 1, 2004, the Teachers/Administrator had not yet received any new records from the plaintiff and another letter was sent to the plaintiff requesting that she provide the information. Id.

On March 12, 2004, the plaintiff submitted additional documents to the Teachers/Administrator, and these records showed that she did not have the second back surgery. Def. Acad.'s Stmt. ¶ 38. Also included in this submission was a letter from Dr. Stopak, dated January 23, 2004, stating that the plaintiff is "permanently disabled" and "cannot return to any type of gainful employment."[9] Pl.'s Stmt. ¶ 15.

On June 7, 2004, the Teachers/Administrator asked the plaintiff to provide additional information to substantiate her disability claim, Def. Acad.'s Stmt. ¶ 39, noting that they did "not have sufficient medical documentation to subtant[iate] your current limits and restrictions or that you are under the Regular Care of a Physician." Defs. Teachers'/Adm'or's Mem., Ex. A to Decl. of Andrew M. Altschul at A.R. 1380. On June 24, 2004, the plaintiff provided a "supplemental neurosurgical report" from Dr. Stopak, declaring that the plaintiff "continues to have . . .

---

[9] The body of this letter from Dr. Stopak reads in full:

> The above referenced patient is permanently disabled due to her intractable low back and leg pain. She cannot return to any type of gainful employment.

Defs. Teachers'/Adm'or's Mem., Ex. A to Decl. of Andrew M. Altschul at A.R. 1440.

incapacitating back and leg pain" and that her "[p]rognosis is guarded."[10]  Pl.'s Stmt. ¶ 16.  The

Teachers/Administrator considered this letter to be an "unsubstantiated statement" containing

"minimal information[.]"  Def. Acad.'s Stmt. ¶ 40.  Thus, after coordinating logistics with the

plaintiff, the Teachers/Administrator scheduled an IM Examination as well as a Functional

Capacity Exam ("FC Examination") for July 27, 2004, to be administered in Florida, where the

plaintiff said she would be at that time.  Pl.'s Stmt. ¶ 17; Def. Acad.'s Stmt. ¶ 41.  However, the

plaintiff did not appear for either examination.  Pl.'s Stmt. ¶ 18; Def. Acad.'s Stmt. ¶ 41.

On August 12, 2004, the Teachers/Administrator sent the plaintiff a letter stating they

were discontinuing her benefits.  Pl.'s Stmt. ¶ 18.  The letter reviewed the evidence the plaintiff

had provided, recounted the Teachers'/Administrator's difficulties in communicating with the

plaintiff, and stated her benefits were being discontinued because the Teachers/Administrator

"lack[ed] objective medical documentation to support [her] inability to perform any occupation

for which [she would] qualify based on her education, training, experience, and capabilities."

Defs. Teachers'/Adm'or's Mem., Ex. A to Decl. of Andrew M. Altschul at A.R. 1391.

On October 18, 2004, the plaintiff appealed the discontinuation of her benefits.  Def.

Acad.'s Stmt. ¶ 43.  The Teachers/Administrator responded by letter dated November 1, 2004,

and offered the plaintiff the opportunity to undergo another IM Examination and an FC

Examination.  Id. ¶ 44.  The plaintiff did not respond to the offer, and follow-up letters were

---

[10]  The text of this supplemental report reads in full:

> [Plaintiff] continues to have . . . incapacitating back and leg pain.  We are still
> waiting to schedule the surgery on [the plaintiff] as previously mentioned.  The
> lumber reexploration and disectomy at two levels, L3-4 and L4-5 and a fusion.
>
> Prognosis is guarded.  In the meantime there is no way she can return to any
> type of work whatsoever at this time.

Id., at A.R. 1439.

mailed to her on December 21, 2004, and January 8, 2005, both requesting that the plaintiff undergo the IM and FC Examinations.  Id. ¶¶ 44-45.

On January 25, 2005, the plaintiff provided additional records to the Teachers/Administrator.  Pl.'s Stmt. ¶ 19.[11]  Included were more records from Dr. Stopak, dated September 16, and 17, 2004.  Id. ¶¶ 19-21.  In his Ortho/Neuro Physician's Report dated September 16, Dr. Stopak observed that the plaintiff walked "with a marked limp favoring the right leg in a bent over antalgic position," and that she "experienced great difficulty changing positions from sitting to standing and mounting the examining table."  Id., Ex. 7 at A.R. 426.  He noted associated numbness and subjective weakness of her right leg.  Id.  Dr. Stopak's impression was that there had been "exacerbation of previous pathology of the spine with ruptured lumbar discs at the L3-4 and L4-5 levels and a grade I retrolisthesis at L4-5 with instability."  Id.  The plaintiff's prognosis was listed as "[g]uarded," and Dr. Stopak added that the plaintiff "is not ready to return to work."  Id.  Surgery in the form of a total decompressive lumbar laminectomy was recommended.  Id.  In the September 17, 2004, Ortho/Neuro Questionnaire, Dr. Stopak indicated that the plaintiff was "unable to walk, sit, stand, lift, carry, push, pull or perform repetitive actions with her hands."  Pl.'s Stmt. ¶ 20.[12]

In February 2005, the Teachers/Administrator conducted a review of the plaintiff's claim. Def. Acad.'s Stmt. ¶ 46.  Her records were reviewed by Dr. Mary Lindquist, a consulting

---

[11]  There is disagreement as to when these materials were submitted, with the defendants representing that these documents were submitted in October 2004 as part of the plaintiff's appeal.  Def. Acad.'s Stmt. ¶¶ 43-46.  However, whether they arrived in October 2004 or January 2005 is not material to the outcome of the case.  What matters is that the defendants received these documents and considered them during their reviews of the plaintiff's appeal.

[12]  The plaintiff provides no citation for this document, Pl.'s Stmt ¶ 20, and it does not appear to be included among the plaintiff's exhibits or the administrative record filings in this case.  The defendants provide a reference to the document in the record, Def. Acad.'s Opp'n at 15, and challenge its favorability to the plaintiff's case, id. at 16. Nevertheless, the Court must accord the plaintiff the benefit of the doubt and assumes her description of the document is accurate.

physician for the Teachers/Administrator with a specialty in internal medicine. Defs.

Teachers'/Adm'or's Mem., Ex. A to Decl. of Andrew M. Altschul at A.R. 1413. Dr. Lindquist

summarized the plaintiff's medical history, including the recently submitted reports from Dr.

Stopak. Id. Dr. Lindquist found some inconsistencies between Dr. Stopak's findings and those

of the other physicians who had interpreted the plaintiff's records, notably the results of the

February 2003 CT scan. Id., at A.R. 1412. In particular, Dr. Lindquist observed that

> the radiologist's interpretation of this study varied significantly
> from Dr. [Stopak]'s interpretation, wherein he describes 'ruptured
> lumbar discs at L3-4 and L4-5 with grade-1 retrolisthesis at L4-5
> with instability' in his note from September 16, 2004. The only
> significant finding described was right L3 nerve root impairment.
> The patient's history and physical exam findings, however, are not
> consistent with an L3 radiculopathy.

Id. Dr. Lindquist also noted the plaintiff s failure to undergo the IM and FC Examinations, and

commented on the absence of further medical evidence to review. Id., at A.R. 1411-1412. She

opined that from the documentation provided, "it is likely that the claimant would be capable of

work in the sedentary, possibly light categories of work," id., at A.R. 1411, and concluded that

"the medical information provided does not support that the claimant has limitations and

restrictions due to her back condition that would preclude her performing any gainful

employment[,]" id.

On March 9, 2005, the Teachers/Administrator referred the plaintiff's file for a

transferable skills assessment. Def. Acad.'s Stmt. ¶ 48. The response to the referral concluded

that the plaintiff "does not have limitations or restrictions which would prevent her from

performing full-time, sedentary level work."[13] Defs. Teachers'/Adm'or's Mem., Ex. A to Decl.

---

[13] The Teachers/Administrator used the definition of the sedentary work employed by the Department of Labor,
which provides:

(continued…)

of Andrew M. Altschul at A.R. 1422.  The skills assessment identified six occupations in the Washington D.C. area, including the positions of personnel clerk, user support analyst, and administrative assistant, that "match the [plaintiff's] functional capacity, education, training, and experience."  Id., at A.R. 1420-21.

On March 15, 2005, the Teachers/Administrator sent the plaintiff a letter explaining the reasons for closing her benefits' claim.  Def. Acad.'s Stmt. ¶ 48.  This letter summarized the plaintiff's medical condition as reflected by all the documents she had submitted, and concluded the Teachers/Administrator was denying her request for benefits because she was found to be "capable of performing other occupations for which you are reasonably qualified by your education, training, experience, and physical functional abilities." Defs. Teachers'/Adm'or's Mem., Ex. A to Decl. of Andrew M. Altschul at A.R. 1428.  The letter added that "[y]ou are entitled to one independent review under the terms of your group coverage.  We have completed that review and we will not be able to be of further assistance to you.  This concludes the administrative review process by the Quality Assurance Unit."  Id.

On May 5, 2005, a representative from the District of Columbia Department of Insurance and Securities Regulation (the "D.C. Department of Insurance") informed the Teachers/Administrator that the plaintiff was arranging to have an IM Examination conducted. Def. Acad.'s Stmt. ¶ 50.  Several months earlier, in November 2004, the plaintiff had filed a complaint with the D.C. Department of Insurance, and following that filing the

---

(. . . continued)

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a) (2009).

Teachers/Administrator and the D.C. Department of Insurance were in contact concerning the status of the plaintiff's claim. Defs. Teachers'/Adm'or's Mem. at 12. The D.C. Department of Insurance representative inquired if the Teachers/Administrator would be willing to pay for the examination, and the Teachers/Administrator agreed to do so. Def. Acad.'s Stmt. ¶ 50.

The plaintiff submitted to an FC Examination on June 21, 2005, Pl.'s Stmt. ¶ 26, and it was concluded that she was generally capable of performing sedentary work. Defs. Teachers'/Adm'or's Mem., Ex. A to Decl. of Andrew M. Altschul at A.R. 1478. The FC Examination reported that confirming whether the plaintiff could work a full eight hour day was "difficult to predict" because the extent of her self-limiting activities "heavily influenced the outcome of the test." Id., at A.R. 1484. According to the report, during the examination the plaintiff "self-limited on 79% of the 14 tasks" she performed, meaning she "stopped the task before a maximum effort was reached[,]" which can be caused by "1) Pain, 2) Psychological issues such as fear of reinjury, anxiety, depression and/or 3) Attempts to manipulate the test results." Id.[14] The FC Examination also observed several "Function to Function Test Inconsistencies" and found that the plaintiff was "making tasks more difficult than necessary." Id., at A.R. 1481-82. Specifically, the FC Examination reported:

- Gait was antalgic on [r]ight side at beginning of test and antalgic on left side when leaving after the test.
- During the walking test in the mobility section, [the plaintiff] only ambulated 20 feet, however, she walked into the clinic and out of the clinic to her car without stopping and that [is] over 50 feet.
- Could not push empty sled with Upper body resting on handle, even though she stated she shopped in that position.

_____

[14] The report further states that "[a]lthough it is difficult to determine the cause of self-limiting behavior, . . . research indicates that motivated clients self-limit on no more than 20% of test items" and that "[i]f the self-limiting exceeds 20% then psychological and/or motivational factors are affecting test results." Id., at A.R. 1484. Moreover, the plaintiff "failed 7 of the 7 consistency criteria" on a "Hand Strength Assessment" test, which according to the "User's Guide" for the test, there is a "significantly less than one in one million" chance that a patient will fail all seven consistency criteria. Id., at A.R. 1483 (emphasis in original).

[The plaintiff's heart rate] during her maximal pushing and pulling test was actually lower during the performance of the task than when she was walking to the chair and resting.

- During her stair ambulation test, [the plaintiff] ambulated up the stairs leading with the left foot, however, instead of descending down the stairs with the right leg (the involved leg), she lead with the left leg.  This gait pattern puts all of her body weight on her right leg.  During level surface ambulation, [the plaintiff] avoided placing full weight on the right leg via antalgic gait pattern.

Id.

One month later, on July 21, 2005, the plaintiff underwent another IM Examination.  Def. Acad.'s Stmt. ¶ 55.  The evaluating neurologist, Dr. John Hennessey, reviewed the plaintiff's medical history, including all the records submitted by Dr. Stopak, and conducted a physical and neurological examination.  Defs. Teachers'/Adm'or's Mem., Ex. A to Decl. of Andrew M. Altschul at A.R. 1526-32.  As to Dr. Stopak's findings, Dr. Hennessey pointed out that Dr. Stopak's examination of the plaintiff following her second automobile accident "actually" showed "an improvement" from her exam two months before the accident, even though Dr. Stopak's assessment of the plaintiff's condition "at this point is exacerbation of prior pathology." Id., at A.R. 1531.  Dr. Hennessey also thought it puzzling that Dr. Stopak mentioned the plaintiff's incapacitating back and leg pain in June 2004, but failed to say on what side of her body she was experiencing the pain.  Id.

Following his physical exam, Dr. Hennessey's assessment was that the plaintiff "had an incredible amount of breakthrough weakness which, quite frankly, was completely inconsistent with what she did on her feet in walking to the office and getting on and off the exam table."  Id., at A.R. 1528.  He further commented that "there are gross inadequacies between what the [plaintiff] can perform when she's not on the exam table versus what she does on the exam

table." Id., at A.R. 1526. Dr. Hennesey concluded that "my objective findings do not correlate with the [plaintiff's] stated diagnosis and findings." Id.

In terms of the plaintiff's ability to return to work, Dr. Hennessey admitted that this was difficult to determine because of the plaintiff's self-limiting behavior, but opined that the she "is ready for sedentary activity and I would probably start her off on half-day activity, namely, four hours with . . . breaks every [thirty] minutes to one hour based on needs." Id., at A.R. 1525. Dr. Hennessey predicted that the plaintiff could "return to full-time work in a sedentary capacity within a month or two of starting half a day work cycles." Id.

On September 26, 2005, the Teachers/Administrator sent a letter to plaintiff informing her of their conclusion that she "no longer meets the definition of Disability as defined in the group policy." Id., at A.R. 1519. The letter further reviewed the appeals process previously conducted by the Teachers/Administrator and explained that it satisfied the independent review under the Policy. Id., at A.R. 1516-19. The letter concluded:

> You are entitled to one independent review under the terms of your group policy and the Employee Benefits – Quality Assurance Unit has previously provided that review. You previously requested copies of the records used in our decision to close your claim. That has also been provided to you. Therefore, this concludes our handling of this claim.

Id., at A.R. 1516.

On March 26, 2006, the plaintiff attempted to supplement her file with additional records but the Teachers/Administrator refused to consider them, Pl.'s Stmt. ¶¶ 32-33, and advised the plaintiff in a letter on April 12, 2006, that they were declining to further review her claim. Id. ¶ 33. The letter noted that the terms of the group policy and Department of Labor regulations provide for only one administrative review of her claim, Defs. Teachers'/Adm'or's Mem., Ex. A to Decl. of Andrew M. Altschul at A.R. 1540, and that the Teachers/Administrator "has already

completed an administrative review of your claim and respectfully decline[s] to review your claim file." Id., at A.R. 1539.

Having exhausted her administrative remedies, the plaintiff brought this action seeking judicial review of the termination of her long-term benefits, arguing that the defendants violated the ERISA by wrongfully denying her disability benefits and by following improper procedures in the course of their administrative review of her claim. Compl. ¶¶ 1, 13, 16-17. The plaintiff seeks reinstatement of her long term benefits, award of the benefits she has not received since September 2004, payment for lost pension contributions, prejudgment interest, and attorneys' fees. Compl. ¶ 18. The defendants deny all of the plaintiff's allegations and maintain that they acted in accordance with the terms of the Academy Plan and the ERISA when they rendered the decision to terminate the plaintiff's benefits.[15] See generally Def. Acad.'s Answer; Defs. Teachers'/Adm'or's Answer. Based on the administrative record submitted to the Court, Def. Acad.'s Plan (Decl. of Andrew M. Altschul regarding the administrative record), both parties seek summary judgment.

## II. STANDARD OF REVIEW

To grant the defendants' motion for summary judgment under Rule 56(c), this Court must find that "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Under Rule 56(c), if a party fails "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment is warranted. Celotex Corp. v. Catrett, 477 U.S.

---

[15] The Teachers/Administrator also argue in the alternative that this case is barred by the contractual limitation period. Defs. Teachers'/Adm'or's Mem. at 20-21. However, because the Court finds against the plaintiff on all of her claims, it does not address this argument.

317, 322 (1986); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986). "By its very terms, this standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson</u>, 477 U.S. at 247-48 (emphasis in original). In other words, only "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Id.</u> at 248.

Under the ERISA, a participant in or a beneficiary of a covered plan may sue to "recover benefits due to h[er] under the terms of the plan, to enforce h[er] rights under the terms of the plan, or to clarify h[er] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Although the "ERISA does not set out the appropriate standard of review for [courts to apply] in actions under § 1132(a)(1)(B) challenging benefit eligibility determinations," <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 109 (1989), the Supreme Court held that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard, not under the more deferential arbitrary and capricious standard, "<u>unless the benefit plan gives the administrator or fiduciary discretionary authority to determine the eligibility for benefits or to construe the terms of the plan</u>." <u>Fitts v. Fed Nat'l Mortgage Ass'n</u>, 236 F.3d 1, 5 (D.C. Cir. 2001) (emphasis added) (quoting <u>Firestone</u>, 489 U.S. at 115).

Therefore, in order to determine whether deferential or de novo review applies, the Court must examine whether the administrator or fiduciary whose decision the plaintiff is challenging was granted discretion to make eligibility determinations. <u>Metro. Life Ins. Co. v. Glenn</u> ("Glenn"), __ U.S. __, __, 128 S. Ct. 2343, 2348 (2008). In making this determination, the Court is "guided by principles of trust law" and may "not interfere to control [the defendants' eligibility determination] in the exercise of a <u>discretion</u>[,] [if that discretion was] <u>vested in them</u>

by the instrument under which they act." Firestone, 489 U.S. at 111 (emphasis in original); see also Glenn, __ U.S. at __, 128 S. Ct. at 2348 ("Where the plan provides to the contrary by granting 'the administrator or fiduciary discretionary authority to determine eligibility for benefits,' '[t]rust principles make a deferential standard of review appropriate." (emphasis in original) (citing Firestone, 489 U.S. at 111, 115).  "In determining whether a plan grants the administrator discretionary authority, the reviewing court should focus on 'the character of the authority exercised by the administrators under the plan,' not on whether the plan uses the word 'discretion' or any other 'magic word.'" Wright v. Metro. Life Ins. Co., 618 F. Supp. 2d 43, 52 (D.D.C. 2009) (Walton, J.) (citing Block v. Pitney Bowes Inc., 952 F.2d 1450, 1453 (D.C. Cir. 1992)).

    The parties dispute what standard of review the Court should apply in this case.[16]  Pl.'s Mem. at 2-3; Def. Acad.'s Mem. at 2-3; Defs. Teachers'/Adm'or's Mem. at 16-17.  The plaintiff offers a two-step argument for why de novo review is appropriate.  First, while she concedes that the Academy Plan and the Plan Description grant discretion to the Academy to administer the Plan, Pl.'s Mem. at 3; Pl.'s Opp'n to Teachers'/Adm'or's Mot. at 2, she argues that because the Academy had no hands-on role either in the denial of her claim or her administrative appeal, the Academy Plan and the Plan Description are essentially irrelevant to her particular case.  See Pl.'s Mem at 3; Pl.'s Opp'n to Acad.'s Mot. at 2-4.  Instead of analyzing the impact of these documents, the plaintiff urges the Court to scrutinize the Policy itself.  Pl.'s' Mem. at 2-3; Pl.'s Opp'n to Acad.'s Mot. at 2-3.  And second, focusing on the Policy itself, the plaintiff contends that it "does not reference the [Academy] [P]lan document," Pl.'s Mem. at 3, and that its terms

---

[16]  The plaintiff even declares the standard of review is the "core issue" for the Court to decide in this case, Pl.'s Reply at 1, and contends further that this "case is primarily about the standard of review and whether it has been abused." Id. at 2.

"fail to articulate a grant of discretion to [the Teachers/Administrator]." Pl.'s Opp'n to Teachers'/Adm'or's Mot. at 2.

In response, the defendants maintain that the deferential standard of review should be employed, emphasizing language found in the Academy Plan and the Plan Description, and asserting that the Teachers/Administrator were expressly granted discretionary authority to make eligibility determinations. Def. Acad.'s Mem. at 2-3; Defs. Teachers'/Adm'or's Mem. at 16-17. Upon reviewing the Academy Plan, the Plan Description, the Policy, and the applicable legal authority, the Court agrees with the defendants' position that the Teachers/Administrator is the administrator of the Academy Plan and is empowered with the express discretion to render benefit eligibility decisions, and therefore, the deferential standard of review must be applied in this case.

To begin with, the plaintiff's argument regarding Academy personnel not being involved in administering her specific claim and therefore her emphasis on the Policy itself is misplaced.[17] As the Supreme Court has made clear, in determining the standard of review to employ the Court must examine whether the "benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone, 489 U.S. at 115 (emphasis added). See Wright, 618 F. Supp. 2d at 52 ("[T]he reviewing court should focus on 'the character of the authority exercised by the administrators under the plan.'") (emphasis added) (citing Block v. Pitney Bowes Inc., 952 F.2d 1450, 1453) (D.C. Cir. 1992); Costantino v. Washington Post Multi-Option Benefits Plan, 404 F. Supp. 2d. 31, 38 (D.D.C.

---

[17]   The plaintiff's related argument concerning the Policy not referencing the Academy Plan is factually incorrect. The cover page of the Policy lists the Academy as the employer. Def. Acad.'s Mem., Attach. C to Decl. of Shelia Wright at A.R. 169. Even more plainly, the section of the Policy describing the participant's rights under the ERISA clearly designates the Academy as the plan administrator. Id., at A.R. 138. The fact that the policy does not expressly mention the SB Administrators is hardly surprising, given that the policy dates back to 1998 and the SB Administrators did not assume administration responsibilities until 2003. Defs. Teachers'/Adm'or's Mem. at 2.

2005) ("In determining whether an employee welfare benefits plan confers discretion on a fiduciary, courts . . . look to the plan documents.") (emphasis added).  The Plan Description is an important component of benefit plans under the ERISA, as the statute requires that a Plan Description be created and provided to participants in the plan by employers.  See 29 U.S.C. § 1022(a) (requiring employers to provide participants with a copy of a Plan Description that shall "be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan."); see also id. § 1104(a)(1)(D) (instructing benefit plan fiduciaries to discharge their duties "in accordance with the documents and instruments governing the plan") (emphasis added).  Accordingly, it is proper to consider the Plan Description as part of the employee benefit plan in analyzing whether a grant of discretionary authority was made to the administrators of the Academy Plan.  See Brubaker v. Metropolitan Life Ins. Co., No. 00-2511, 2005 WL 3198969, at *3 (D.D.C. Sept. 26, 2005) ("the [Plan Description] should be considered part of the Plan documents"); Costantino, 404 F. Supp. 2d at 41 ("Because the [Plan Description] granted the [administrator] discretionary authority to determine . . . benefits and [to] interpret provisions of the [Washington Post Long-Term Disability] Plan . . . [,] the Court must apply the abuse of discretion standard to a review of [the] decision to terminate . . . benefits."); Guyther v. Dept of Labor Fed. Credit Union, 193 F. Supp. 2d. 127, 130 (D.D.C. 2002) ("[Plan Descriptions] often control over conflicting language in plan agreements anyway, because (it is thought) employees actually read the summaries."); see also Bergt v. Ret. Plan for Pilots Employed by MarkAir, 293 F.3d 1139, 1143 (9th Cir. 2002) ("[W]e conclude the [Plan Description] is a plan document and should be considered when interpreting an ERISA plan."); Whiteman v. Graphic Commc'ns Int'l Union Supplemental Ret. & Disability

Fund, 871 F. Supp. 465, 466-67 (D.D.C. 1994) (finding the plaintiff was entitled to benefits where she met the language set out in the [Plan Description] even though she did not meet the language set out in the benefit plan itself).

Turning to the Academy Plan and its Plan Description, the Court has no trouble concluding that they grant the Teachers/Administrator discretion to administer benefit claims. Under the Academy Plan, the plan administrator, the Academy, Acad. Plan at 3.1 ("The Academy shall be the Plan Administrator and the 'Named Fiduciary' within the meaning of Section 402 of [the] ERISA"), has "absolute power, authority and discretion to administer the Plan," id. at 3.2, and has the authority to "appoint such accountants, counsel, specialists and other persons as it deems necessary or desirable in connection with the administration of the Plan," id. at 3.2. The Plan Description provides that the "determination of your disability is made by the insurance carrier," Plan Description at 3, which is clearly identified as the Teachers' Association in the section describing the participant's rights under the ERISA, id. at 12. Moreover, the Plan Description expressly declares that the "[Teachers' Association] has full power and discretionary authority under the group policy . . . subject only to the participant's rights of review and appeal under the group policy." Plan Description at 8. The same paragraph adds that the

> [Teachers' Association] has all powers necessary to accomplish these purposes in accordance with the terms of the group policy including, but not limited to, the following: (1) determining the benefits and amounts payable therefore[e] to any participant or beneficiary; (2) establishing and administering a claims review and appeal process; and (3) interpreting, applying, and administering the provisions of the group policy.

Plan Description at 8.

Accordingly, because the Academy Plan and the Plan Description contain the requisite "empowering language" conveying discretion to the Teachers/Administrator as the Plan's administrator, the Court must employ a discretionary, or "reasonableness" review to the eligibility determination.[18] Block, 952 F.2d at 1453; see also Wagener v. SBC Pension Benefit Plan-Non Bargained Program, 407 F.3d 395, 403 (D.C. Cir. 2005) (stating that where a court is reviewing an interpretation of a benefits plan provision by an administrator or fiduciary under the arbitrary and capricious standard of review, and the plan's language "reasonably supports" that interpretation, a court must defer to the administrator or fiduciary); Mobley v. Continental Cas. Co., 405 F. Supp. 2d 42, 48 (D.D.C. 2005) ("[A] deferential standard of review allows the plan administrator to reach a conclusion that may technically be incorrect so long as it is reasonably supported by the administrative record.").

With respect to plaintiff's claims alleging violations of § 1133 of the ERISA, Compl. ¶ 13, the Court notes that these claims are also reviewed under a deferential, or reasonableness standard and the polestar here is whether there has been "substantial compliance" with this provision and its accompanying regulations. Heller v. Fortis Benefits Ins. Co., 142 F.3d 487, 493 (D.C. Cir. 1998).

---

[18] As noted in an earlier footnote, supra note 4, the plaintiff does not dispute that both the Teachers' Association and the SB Administrators served as administrators of her claim, Compl. ¶¶ 5, 7; Pl.'s Stmt. ¶ 6, and does not distinguish at all between the two organizations in the arguments made in her filings, e.g. Pl.'s Mem. at 2, 4; Pl.'s Opp'n to Teachers'/Adm'or's Mot. at 1-4. Nevertheless, the Court observes that although the SB Administrators is not expressly named in the Plan documents, the SB Administrator's actions at issue in this case would still be reviewed under a deferential standard because the SB Administrators is a fiduciary of the Academy Plan under the ERISA. The ERISA provides that a "fiduciary" is a "person . . . with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). Having taken over the administration duties from the Teachers' Association in 2003, the SB Administrators operates the component of the Academy Plan responsible for administering benefits and appeals, it has discretion to render benefit eligibility determinations. Thus, the SB Administrators also qualifies as a fiduciary by virtue of its role as the claims processor. See Wright, 618 F. Supp. 2d at 52-53 (finding a party qualified as an ERISA fiduciary because the extent of its designated role under the plan brought it within the statutory definition).

# III. LEGAL ANALYSIS

## A. The Wrongful Denial of Benefits Claim

The plaintiff argues the defendants wrongly requested that she provide "objective medical documentation" to prove her claim, when all the Policy requires, according to her interpretation of it, is that she "show she is in fact 'disabled.'" Pl.'s Mem. at 4. The plaintiff claims she established her disability through her multiple submissions of medical records, particularly those from her treating physician, Dr. Stopak. Id. at 4-5. The defendants respond that the record in this case, even considering all the documents the plaintiff emphasizes, shows that she is not totally disabled within the meaning of the Policy. Def. Acad.'s Mem. at 17-20; Defs. Teachers'/Adm'or's Mem. at 4-9. The defendants acknowledge that the Policy does not use the exact phrase "objective medical documentation," but nonetheless assert that they have a right to demand objective proof of the plaintiff's disability as the most logical means of administering the Policy. Def. Acad.'s Opp'n at 5-6; Defs. Teachers'/Adm'or's Opp'n at 4-5. For the following reasons, the Court agrees with the defendants.

To demonstrate a disability, the Policy requires a participant to provide some "proof of Total Disability," which can be in the form of "statements of treating physicians, copies of test reports or examinations, x-rays; hospital records; [or] medical examinations by impartial specialists." Def. Acad.'s Mem., Attach. C to Decl. of Sheila Wright at A.R. 146. It is understandable that the Policy does not use the exact phrase "objective medical documentation," because the Policy identifies examples of the types of medical "proof" a participant can submit to objectively demonstrate total disability. See Maniatty v. UNUM Provident Corp., 218 F. Supp. 2d 500, 504 (S.D.N.Y. 2002) ("While plaintiff argues that the plan does not state that objective evidence is necessary to establish disability, the plan does state that 'proof' of

continued disability must be provided . . . and the very concept of proof connotes objectivity.").

Indeed, as the defendants correctly point out, Def. Acad.'s Opp'n at 5-7; Defs.

Teachers'/Adm'or's Opp'n at 4-6, if objective medical evidence was not required, reviewing the validity of long term disability claims would be meaningless because plan administrators would be forced to accept as adequate all subjective claims of participants.  See Williams v. UNUM Life Ins. Co. of Am., 250 F. Supp. 2d 641, 648-49 (E.D. Va. 2003) ("[I]t is hardly unreasonable for the administrator to require an objective component to such proof [of disability].") (citing Maniatty, 218 F. Supp. 2d at 504); Coffman v. Metro. Life Ins. Co., 217 F. Supp. 2d 715, 732 (S.D. W.Va. 2002) ("Were an opposite rule to apply, [long-term disability] benefits would be payable to any participant with subjective and effervescent symptomotology simply because the symptoms were first passed through the intermediate step of self-reporting to a medical professional."), aff'd, 77 F. App'x. 174 (4th Cir. 2003); see also Doyle v. Liberty Life Assur. Co. of Boston, 542 F.3d 1352, 1362-63 (11th Cir. 2008) ("We do not believe . . . that [the administrator's] preference for medical opinions grounded in objective medical evidence is somehow indicative that its decision was unreasonable . . . ."); Parkman v. Prudential Ins. Co. of Am., 439 F.3d 767, 773 (8th Cir. 2006) ("It is not unreasonable for a plan administrator to deny benefits based upon a lack of objective evidence.").

With respect to the plaintiff's other argument, the Court cannot find that the defendants' conclusion that the plaintiff was not "totally disabled" within the meaning of the Policy was unreasonable.  As discussed above, a plan administrator's determination "will be upheld 'so long as it is reasonably supported by the administrative record.'"  Hall v. Nat'l R.R. Passenger Corp., 559 F. Supp. 2d 38, 48 (D.D.C. 2008) (quoting Mobley, 405 F. Supp. 2d at 48)).  A discretionary decision "will be found to be reasonable if it is "the result of a deliberate, principled reasoning

process and if it is supported by substantial evidence," <u>Buford v. UNUM Life Ins. Co. of Am.</u>, 290 F. Supp. 2d 92, 100 (D.D.C. 2003) (quoting <u>Brogan v. Holland</u>, 105 F.3d 158, 161 (4th Cir. 1997)), and the Court "must not overturn a decision found to be reasonable even if an alternative decision also could have been considered reasonable." <u>Buford</u>, 290 F. Supp. 2d at 100 (citing <u>Block</u> 952 F.2d at 1452).

Here, the defendants had ample evidence in the administrative record actually showing that the plaintiff did not meet the requirements necessary to demonstrate her total disability under the Policy, namely, the absence of proof that she was under the "Regular Care of a Physician" and proof that she was incapable of performing "the material and substantial duties of any occupation" she was qualified to perform. Def. Acad.'s Mem., Attach. C to Decl. of Shelia Wright at A.R. 143. For example, the plaintiff admits seeing a doctor just once between November 2000 and February 2003, <u>see</u> Pl.'s Stmt. ¶ 12, and it is not clear how often she was treated or examined by any physician in the time period between April 24, 2003 and September 16, 2004. <u>Id.</u> ¶¶ 15-19. More significant, though, and what the defendants ultimately relied upon in closing her claim, is that multiple evaluations of the plaintiff's medical records and capabilities found her able to perform some amount of sedentary work. Indeed, that was the conclusion reached by the August 2002 IM Examination conducted by Dr. Kobrine, the February 2005 review by Dr. Lindquist, the March 2005 transferable skills assessment, the June 2005 FC Examination, and the July 2005 IM Examination conducted by Dr. Hennessey. And although the FC Examination qualified its conclusion because of the plaintiff's extensive self-limiting behavior, it was not unreasonable for the Teachers/Administrator to rely on it as a basis for concluding that the plaintiff could perform several types of sedentary work. <u>See</u> <u>Chalker v. Raytheon Co.</u>, 291 F. App'x. 138, 144 (10th Cir. 2008) (finding it not unreasonable for an

administrator to rely on an FC Examination that "may" have had "some flaws" because it was "not so flawed that it could not have provided . . . any reasonable basis to terminate [the participant's] benefits"); Hensley v. Int'l Bus. Machs. Corp., 123 F. App'x. 534, 539 (4th Cir. 2004) (reliance on FC Examinations as a basis for finding that plaintiff "was capable of sedentary occupation" even though the physical therapist could not "assess [the plaintiff's] full physical capacities" was not unreasonable "given her non-cooperation in both FC Examinations"); Wise v. Hartford Life & Accident Ins. Co, 403 F. Supp. 2d 1266, 1276 (N.D. Ga. 2005) (recognizing that FC Examinations are "the best means of assessing an individual's function level"). Also, the fact that it took about a year to finally have the plaintiff undergo the July 2005 IM Examination cuts sharply against the criticisms she raises about the decision denying her request for benefits. Cf. Black v. Pitney Bowes Inc., No. 05-108, 2008 U.S. Dist. LEXIS 65338, at *27 (S.D.N.Y. Aug. 26, 2008) (finding the plaintiff's "failure to submit to an IM[ Examination] and to provide the information . . . requested of him both constitutes an independent procedural default warranting denial of his application, and provides a basis for a reasonable decision-maker to discount the evidence of disability he provided"). On this record there was more than substantial evidence to support the determination that the plaintiff was capable of performing some amount of sedentary work, and therefore was not totally disabled under the Policy.[19] That judgment was reasonable and the Court may not disturb it.

---

[19] The cases the plaintiff cites in support of her argument, even if they were binding authority on this Court, present factual scenarios that are markedly different from the one here. For example, in Smith v. Metropolitan Life Ins. Co., 274 F. App'x. 251 (4th Cir. 2008), the administrator relied on a "clerical error" in denying the claim, the medical record at issue having the word "normal" inserted (likely instead of "abnormal") to describe the claimant's vision. Id. at 256. This conclusion was supported by the surrounding context of the apparent erroneous notation, which used terminology unmistakably referring to a visual impairment, and the administrator's own expert even admitted the claimant was "legally blind" in the same eye characterized as "normal" in the challenged medical record. Id. And in Donovan v. Eaton Corp., 462 F.3d 321 (4th Cir. 2006), the administrator denied a claim for benefits based on an older physician's statement declaring the claimant was not disabled, even though the claimant more recently underwent testing and the same doctor submitted a sworn affidavit attesting to the claimant's disability. Id. at 328-29.

The plaintiff also argues the defendants arbitrarily disregarded the conclusions of her treating physician, Dr. Stopak, and gave unfair weight to the opinions of their own paid consultants. See Pl.'s Mem. at 5-9. The defendants respond that it is fair to rely on their own experts, and that Dr. Stopak's conclusions were specifically considered and ultimately rejected during the process of evaluating the plaintiff's claim. Defs. Teachers'/Adm'or's Opp'n at 3-8; Def. Acad.'s Opp'n at 8-17. The Court finds the defendants' position more convincing.

The medical records the plaintiff points to, particularly Dr. Stopak's reports from 2004, simply do not support the weighty significance she places on them. Dr. Stopak's January 2004 report declaring the plaintiff "permanently disabled" and incapable of "return[ing] to any type of gainful employment" is comprised of just two sentences. Supra note 9. And his neurological report from June 2004 stating that the plaintiff has "incapacitating pain" and cannot return to work consists of only five sentences. Supra note 10. Significantly, neither document demonstrates that Dr. Stopak saw or physically examined the plaintiff on those particular dates, nor shows he conducted or ordered and reviewed any diagnostic tests, thus calling into question his familiarity with the plaintiff's condition at those specific times, as well as the persuasiveness of his findings. See Hensley, 123 F. App'x. at 538-39 (discounting evidence from plaintiff's treating physicians when they referred only to subjective symptoms expressed by the plaintiff and absent any supportive objective medical evidence); Arthur v. Hartford Life & Accident Ins. Co., 20 F. App'x. 574, 575 (8th Cir. 2001) (affirming denial of benefits where the treating physicians opinions were "conclusory and inconsistent" with other records in the record); Myers v. Iron Workers Dist. Council of S. Ohio & Vicinity Pension Trust, No 04-966, 2005 U.S. Dist. LEXIS 39191, at *32-33 (S.D. Ohio Nov. 7, 2005) (giving little to no weight to plaintiff's

treating physician's conclusory opinion unsupported by clinical observation or examination results), aff'd, 217 F. App'x. 526 (6th Cir. 2007).

Dr. Stopak's reports from September 2004 are more thorough, and demonstrate that he examined the plaintiff at that time and found her unfit to return to work. However, the Supreme Court has made clear that a plan administrator is not required automatically to defer to the conclusions of the treating physician, Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825 (2003), and that the ERISA does not "impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." Id. at 831.[20] In reviewing the plaintiff's claim, Doctors Lindquist and Hennessey specifically considered the evidence provided by Dr. Stopak, and they both found inconsistencies and contradictions in his findings. Dr. Lindquist noted the different interpretations offered by Dr. Stopak and the original radiologist who interpreted the February 2003 CT scan. Dr. Hennessey commented that Dr. Stopak's examination results actually show that the plaintiff's condition improved between her appointments with him in February and April 2003. And Dr. Hennessey observed with seeming consternation that Dr. Stopak's note from June 2004 failed to mention on which side of her body the plaintiff was experiencing "incapacitating" leg pain. Defs. Teachers'/Adm'or's Mem., Ex. A to Decl. of Andrew M. Altschul at A.R. 1531. In any event, "[i]t is not an abuse of discretion to value the opinions of the insurer's own medical consultants over those of the participant's treating physician." Doley v. Prudential Ins. Co. of Am., No. 05-277, 2006 WL 785374, at *2

---

[20] In light of the Supreme Court's unanimous holding in Nord, the plaintiff's reliance on Ferguson v. Hartford Life & Accident Ins. Co., 268 F. Supp. 2d 463 (E.D. Pa. 2003), is entirely misplaced. In Ferguson, the district court found that the plan administrator acted arbitrarily and capriciously because it did not "give any weight, let alone controlling weight" to the opinions of the plaintiff's treating physicians and therefore violated the "treating physician rule." Id. at 468. However, Ferguson was decided before the Supreme Court decision in Nord, which squarely rejected the use of the treating physician rule to employee benefit claims in ERISA cases. See Nord, 538 U.S. at 829 ("courts have no warrant to order application of a treating physician rule to employee benefit claims made under [the] ERISA").

(D.D.C. Mar. 28, 2006); see Jordan v. Northrop Grumman Corp. Welfare Plan, 370 F.3d 869, 880 (9th Cir. 2004) (noting that conflicting reports from a claimant's "treating physician" and the plan's "reviewing physicians . . . is typical of the evidence used in disability determinations," which can cause "[r]easonable people [to] disagree on whether [a claimant] was 'disabled' for purposes of [an] ERISA plan.  Because that is so, the administrator [could] not be characterized as acting arbitrarily in taking the view that [the plaintiff] was not [disabled]"); Salomaa v. Honda Long Term Disability Plan, 542 F. Supp. 2d 1068, 1079 (C.D. Cal. 2008) ("Accepting self-reported symptoms at face value is more of less required of treating physicians, but by no means required of the administrator.") (citing Maniatty, 218 F. Supp. 2d at 504); Roumeliote v. Long Term Disability Plan for Employees of Worthington Indus., 475 F. Supp. 2d 742, 746 (S.D. Ohio 2007) ("[a]s long as a plan administrator offers a reasonable explanation based upon the evidence for its decision, it may choose to rely upon the medical opinion of one doctor over that of another doctor."), aff'd, 292 F. App'x. 472 (6th Cir. 2008).

   The plaintiff also contends that the Teachers'/Administrator's conflict of interest played a role in their decision and that this should be "closely evaluated" by the Court.  Pl.'s Mem. at 3-4.  Admittedly, this is an additional factor the Court must consider in analyzing whether the defendants have interpreted or applied the provisions of the Academy Plan correctly.  Glenn, __ U.S. __, 128 S. Ct. at 2348 ("[A] conflict should be weighed as a factor in determining whether there is an abuse of discretion . . . [, but it does not] impl[y] a change in the standard of review, say from deferential to de novo.") (internal quotations omitted) (citing Firestone, 489 U.S. at 115).  Here, the alleged conflict arises from the fact that the Teachers/Administrator both administers the claims and pays the benefits, and therefore, may have a financial interest in denying claims.  See Glenn, __ U.S. at __, 128 S. Ct. at 2348 (reiterating that where an insurer

both evaluates claims and pays benefits a conflict of interest exists).  However, in this case, the plaintiff "has offered no evidence that any alleged 'self-interested behavior' actually affected the . . . decision to deny . . . [the] benefits" sought by the plaintiff, <u>Becker v. Weinberg Group, Inc. Pension Trust</u>, 473 F. Supp. 2d 48, 62 (D.D.C. 2007), and in light of the Court's earlier discussion concerning the efforts undertaken by the Teachers/Administrator to communicate with the plaintiff, evaluate her file following each of her multiple record submissions, schedule and reschedule several IM and FC Examinations, and ultimately pay for these examinations in the summer of 2005 despite having denied her appeal three months earlier, the Court cannot find that any conflict resulting from their dual roles improperly influenced the ultimate benefits determination.

## B.  The Plaintiff's Procedural Violations Claim

The plaintiff makes two related arguments in alleging the defendants violated her rights under § 1133 of the ERISA.  Pl.'s Mem. at 9-11.  First, she argues that the Teachers/Administrator denied her claim on appeal on March 15, 2005, for a reason different than initially stated on August 12, 2004, largely due to the information provided in Dr. Lindquist's report.  <u>Id.</u> at 9-10.  The plaintiff therefore contends she should have been permitted to appeal Dr. Lindquist's findings, and that not permitting her to do so constituted a violation of § 1133 of the ERISA.  <u>Id.</u>  Along the same lines, the plaintiff asserts that the defendants violated § 1133 of the ERISA when, in March 2006, they did not allow her to appeal the "dispositive basis" for the September 26, 2005 denial, which she identifies as the June and July 2005 FC and IM Examinations.  <u>Id.</u> at 10-11.  For their part, the defendants maintain that they followed the procedure required by the ERISA and the accompanying regulations in resolving the plaintiff's

claim.  Def. Acad.'s Opp'n at 17-21; Defs. Teachers'/Adm'or's Opp'n at 9-10.  For the following reasons, the Court agrees with the defendants.

Based on a review of the record, the plaintiff's claim was denied for the same reason on each occasion — her inability to demonstrate that she was disabled under the terms of the Policy. In particular, the August 12, 2004 denial letter recited the applicable definition of total disability, outlined the history of the Teachers'/Administrator's interactions with the plaintiff at that time, and informed the plaintiff that because the Teachers/Administrator "lack objective medical documentation to support your inability to perform any occupation which you qualify for based on your education, training, experience and capabilities, we have no alternative but to terminate the group disability benefits."  Defs. Teachers'/Adm'or's Mem., Ex. A to Decl. of Andrew M. Altschul at A.R. 1391.  Similarly, the March 15, 2005 denial letter set forth the disability criteria under which the plaintiff's claim was being assessed, reviewed all the evidence she had submitted, and explained why her claim was being denied.  The letter concluded:

> Based on our review, we find that you are capable of performing other occupations for which you are reasonably qualified by your education, training, experience, and physical functional abilities. As you no longer meet the Definition of Disability under the terms of your group policy, we find that the decision to close your claim with payment to you through August 31, 2004 is correct and must be upheld.

Id., at A.R. 1428.  The September 26, 2005 letter states that the Teachers/Administrator "have again concluded that you no longer meet the definition of Disability as defined in the group policy.  Therefore, no further benefits are payable from the [Academy Plan]."  Id., at A.R. 1519. In contrast to what the plaintiff suggests, the FC and IM Examinations were not the dispositive reasons for denying the plaintiff's claim in September 2005; rather, they served as additional

confirmation that the plaintiff was capable of performing some level of sedentary work, and was therefore unable to satisfy the definition of total disability as defined in the Policy.

While there is support for the notion that a benefit plan administrator has failed to provide the full and fair review required by § 1133 if it denies a claim for one reason initially, and then relies on a different basis on the appeal, e.g., Gagliano v. Reliance Standard Life Ins. Co., 547 F.3d 230, 234-237 (4th Cir. 2008) (finding a procedural violation of § 1133 when the administrator denied claim in the second termination letter on a different basis than it did in the first termination letter); Wenner v. Sun Life Assur. Co. of Canada, 482 F.3d 878, 882 (6th Cir. 2007) (declaring that a full and fair review had not been provided when the defendant denied the "claim for one reason, and then turn[ed] around and terminat[ed] [the plaintiff's] benefits for an entirely different and theretofore unmentioned reason"), that is simply not that case here. As the record reflects, the fundamental reason for the denial of the plaintiff's claim remained the same. Indeed, the change was that the weight of the evidence against the plaintiff had even grown stronger.

The plaintiff's argument also misreads the scope and requirements of the ERISA administrative appeals process in several respects. First, the fact that the Teachers/Administrator sent her file to Dr. Lindquist during the appeal is exactly what the ERISA regulations require as part of providing "a full and fair review." 29 C.F.R. § 2560.503-1(h)(3) (2009). Where an initial claim denial is based on a medical judgment, as is the case here, the regulations state that during the review of the claim the plan administrators must "consult with [an appropriate] health care professional" who was not involved in the initial claim denial. Id. §§ 2560.503-1(h)(3)(iii), (h)(3)(v). In addition, the review must consider all evidence submitted by the plaintiff, even if it

was not considered during the initial denial. Id. § 2560.503-1(h)(2)(iv).[21]  Therefore, the fact that

Dr. Lindquist reviewed the plaintiff's records during the course of the administrative appeal, and

the Teachers/Administrator discussed this review in their March 15, 2005 denial letter, was not a

violation of the statute but rather how it is intended to operate.

Moreover, the text of the ERISA, the regulations governing the administrative appeal

process, and the Academy Plan all contemplate that a participant is entitled to one full and fair

review of the initial denial of their claim.  See 29 U.S.C. § 1133 (providing claimants "a

reasonable opportunity" for "a full and fair review" in accordance with regulations issued by the

Department of Labor); 29 C.F.R. § 2560.503-1(h)(1) (noting a claimant "shall have a reasonable

opportunity to appeal an adverse benefit determination" under the ERISA); Acad. Plan at 6.2

(indicating that the Academy "shall schedule an opportunity for a full and fair hearing of the

issue" if the claimant desires an appeal) (emphasis added); Plan Description at 7-8 (providing

that the claimant can appeal and obtain "a full and fair hearing" after an initial claims denial).

The plaintiff admits that her claim was denied in August 2004, and that she subsequently

appealed this decision in January of 2005.  Pl.'s Stmt. ¶¶ 18-19.  And when her appeal was

denied on March 15, 2005, the plaintiff had been afforded the full and fair review of her claim

required by the ERISA.

While not characterized as such by the plaintiff, "her overall argument can be construed

as one that [she] is entitled to further appeals because the final decision was based on new

evidence, as opposed to a new reason."  Balmert v. Reliance Standard Life Ins. Co., No. 07-95,

2008 WL 4404299, at *9 (S.D. Ohio Sept. 23, 2008) (emphasis in original), aff'd, 594 F.3d 496,

---

[21]  If, on appeal, the plan administrator denies a participant's claim for benefits, then the claimant has a right to
obtain the physician consultant's report free of cost, id. § 2560.503-1(j)(3), and use that report as evidence when
challenging the benefit denial in federal court.  See id. § 2560.503-1(j)(4) (providing that denial letters must inform
the claimant of their right to bring a civil action under § 1132(a) of the ERISA).

(6th Cir. 2010). In other words, because Dr. Lindquist's report was the last report completed before her claim was denied in March 2005, the plaintiff contends that she never had the opportunity to respond to that report with her own evidence and therefore should have been afforded another appeal. This argument has been rejected by a number of courts. As recently observed by the Tenth Circuit, allowing "a claimant to receive and rebut medical opinion reports generated in the course of an administrative appeal – even when those reports contain no new factual information and deny benefits on the same basis as the initial decision – would set up an unnecessary cycle of submission, review, re-submission, and re-review." Metzger v. UNUM Life Ins. Co. of Am., 476 F.3d 1161, 1166 (10th Cir. 2007); see Midgett v. Washington Group Int'l Long Term Disability Plan, 561 F.3d 887, 895 (8th Cir. 2009) (noting that an extra cycle of review would undoubtedly prolong the appeal process which is normally supposed to take forty five days to complete) (citing Metzger, 476 F.3d at 1166); Glazer v. Reliance Standard Life Ins. Co., 524 F.3d 1241, 1245 (11th Cir. 2008) (agreeing with the reasoning in Metzger); Kao v. Aetna Life Ins. Co., 647 F. Supp. 2d 397, 417 (D.N.J. 2009) ("[I]f read according to the plaintiff's view, the regulations set up an endless loop of opinions rendered under § (h)(3)(iii).") (citing Metzger, 476 F.3d at 1166); Skipp v. Hartford Life Ins. Co., No. 06-2199, 2008 WL 346107, at *10 (D. Md. Feb. 6, 2008) (calling the approach in Metzger "helpful and instructive.").

This same reasoning applies to the plaintiff's argument that in March of 2006 she was denied the opportunity to challenge the September 25, 2005 denial of her claim. As stated earlier, her claim was denied in September 2005 because she was found to be capable of performing sedentary work and thus was not totally disabled under the Policy. The FC and IM Examinations were not the dispositive basis for this conclusion, and did not provide a new or

novel rationale for the denial; instead, they added support to the same fundamental finding when her claim was denied in August 2004 and again in March 2005.  Furthermore, by March 2006, the Teachers/Administrator had already satisfied their obligations to provide the plaintiff a full and fair review of the denial of her claim, and accordingly were not required under either the ERISA or the Academy Plan to provide her yet another appeal.

### IV.  CONCLUSION

The ERISA controls whether the plaintiff is entitled to long-term disability benefits under the Academy Plan.  With respect to her claims for wrongful denial of her claim for such benefits, the Teachers/Administrator are the administrators of the Academy Plan, which allocates them discretionary authority to interpret and apply its terms.  Based on the record in this case, the Court is unable to find that the defendants' decision to deny the plaintiff long-term disability benefits or their judgment about what medical evidence to rely on are legally flawed as arbitrary and capricious.  And in regards to the plaintiff's claim of procedural non-compliance with the requirements of the ERISA, the Court finds that the defendants provided the plaintiff a full and fair review of her claim and therefore satisfied their obligations under the statute and the applicable administrative regulations.  Accordingly, summary judgment is awarded to the defendants.[22]

**SO ORDERED** this 30th day of March, 2010

REGGIE B. WALTON
United States District Judge

---

[22]  An Order will be entered contemporaneously with the Memorandum Opinion denying the plaintiff's motion for summary judgment, granting the defendants' motion for summary judgment, and closing this case.